Btchardson, J.,
delivered the opinion of the court:
In the year 1869 a mercantile firm in New Orleans imported a large quantity of sugars, which were seized for violation of the revenue-laws on the part of the owners, and by proceedings in the district court of the United States for Louisiana were forfeited, sold, and, after deduction of the cost, expenses, and legal charges, the net proceeds were paid into the United States Treasury. No party appeared before said court as claimant to any share*of the forfeiture, either as collector, surveyor, naval officer, informer, or seizing-officer.
The Secretary of the Treasury distributed one-half the amount to the United States, and the same was covered into the Treas *588 ury, and one-quarter to the collector, surveyor, and naval-officer, in equal shares, without objection.
As to the other quarter a controversy arose. It was claimed by the present claimant as informer or seizing-officer, by several other persons, each as informer, and also by the collector, surveyor, and naval officer, on the ground that there was no informer and no seizing-officer other than one of themselves.
On the 27th of April, 1872, the claimant commenced this action to recover said one-quarter share alleged therein to be due to him as informer or seizing-officer.
On the 9th of May, 1872, the Secretary of the Treasury decided that there was no informer and no seizing-officer other than the collector, surveyor, and naval officer, and, following the opinion of Attorney-General Stanbery, (12 Opins. Attys. Gen., 291,) ordered the money to be paid to those three officers in equal parts. But, before paying the same, the Secretary required of each of said officers a bond of indemnity, with sureties, obligating themselves to refund said money to the Treasury in the event of this case being decided in favor of the claimant by this court, or, on appeal, by the Supreme Court. The bonds v ere so given, approved, and accepted, and the money was thereupon paid in accordance with said order of distribution.
The United States set up two distinct defenses, one to the jurisdiction of the court, and the other to the claim on its merits. We will consider them in the order stated.
The district courts have, and always have had, jurisdiction of suits for the recovery of penalties and forfeitures incurred under any law of the United States. (Act September 24, 1789, 1 Stat. L., 76, § 9, ch. 19; Kev. Stat., § 563.)
By the Act March 2, 1799, section 89, the money recovered in such suits, after deducting all proper charges to be allowed by the court, was required to be received by the collector of customs, who was thereby required “ to pay and distribute the same, without delay, according to law.” (1 Stat. L., 696.) Section 91 provided how the same should be divided among the officers, informers, and the United States. -
Under this law it was held that while the money was within its control the court had jurisdiction to hear and to determine the claims and rights of all parties who demanded to share in the fund arising from forfeitures, and when adjudicated that the collector was bound to pay the same according to the decree *589 of court. Judge Story, iu 1832, said: “ When a sentence of condemnation has been finally pronounced in a case of seizure, the court, as an incident to the possession of the principal cause, lias a right to proceed to decree a distribution of the proceeds according to law. And it is a familiar practice to institute proceedings of this nature whenever a doubt occurs as to the rights of the parties who are entitled to share in the distribution.” (McLane v. The United States, 6 Peters, 404.)
And this opinion has ever since been adopted and followed by the district courts. (Wescott v. Bradford, 4 Wash. C. C. R., 492; Ex parte Cahon, 2 Mason R., 85; La Jeane Eugenie, ib., 409; Hooper v. Fifty-one Casks Brandy, 2 Ware R., 371; The United States v. Fifty thousand Cigars, 1 Lowell R., 22; The United States v. Morris, 10 Wheat. R., 290; Jones v. Shore's Executors, 1 id., 462; The United States v. George, 6 Blatch. R., 45.)
When there was no claimant to the proceeds after forfeiture, as informer or otherwise, before the court in the principal cause, and the money was paid to the collector, the jurisdiction of the district court over the fund and the distribution of the same as incident to the original action terminated. Bat then arose, without express statute provision therefor, and solely on general principles of law, the right of claimants to bring their independent actions of assumpsit against the collector to recover the respective shares to which they might prove themselves entitled. The collector was regarded and treated as merely a ministerial officer, whose duty was to pay the money in his hands to the parties to whom it belonged, when there was no controversy or objection, or when claimants had established their rights by ordinary proceedings in the courts of law, without authority to finally determine the conflicting claims of adverse parties. And suits at law were from time to time brought and maintained against collectors in such cases, and those officers retained the money in their hands, often to large amounts, to await the event of pending actions against them. (Brewster v. Gelston, 1 Paine R., 426; Sawyer v. Steele, 3 Wash. R., 464.)
The Act March 2, 1867, (14 Stat. L., 540, ch. 188; Rev. Stat., § 3090,) provides that after the reduction of charges and expenses, and in certain cases the duties, the residue of the proceeds of fines, penalties, and forfeitures incurred under the provisions of the laws relating to the customs ‘‘shall be paid into the *590 Treasury of the United States, and distributed under the direction of the Secretary of the Treasury” to the informer, seizing’ officer, and other officers, and the United States, as therein specified. Judge Blatchford, in the district court of the southern district of New York, in the case of The United States v. George, (6 Blatch., 33,) reviews with great care the effect of this law, and holds:
1. That the money when received into the registry of the court is not payable directly into the Treasury of the United States, but must be paid to the collector of the port as before, and that the collector, after deducting duties and other charges, must pay the same into the Treasury.
2. That while the money remains in the registry the court has the same jurisdiction which it had previously to determine the rights of parties claiming the fund as informers, officers, and otherwise, and the court having made a decree determining these rights, the Secretary of the Treasury, when the money reaches him, is bound to distribute the same accordingly.
In his opinion in that case Judge Blatchford says: “The effect of the change made by the act of 1867, in regard to the channel of distribution, is merely to substitute the Treasury of the United States as aplace of deposit for the money, when nothing is left to be done in regard to it but to distribute it, and to substitute the Secretary of the Treasury for the collector as-a ministerial agent of distribution.” And as to the jurisdiction of the district courts, he adds: “ This jurisdiction being well established, there is nothing in the act of 1867 which takes it away or which confers on the Secretary of the Treasury any more power to decide disputed claims to the fund than the collector had under the act of 1799. The judicial tribunal which has the custody of the fund is the proper forum to entertain and decide disputes as to shares in the fund, and to direct how it shall be distributed, and to what persons, under the act of 1867, under the direction of the Secretary of the Treasury as a ministerial officer.”
If, then, the Secretary of the Treasury is, by the act of 1867, merely substituted for the collector as a ministerial officer to distribute the funds, and the distribution is to be under his direction only as such ministerial officer, and if- while the money is under its control the court in which the suit for forfeiture is pending may still determine, as under the law of 1799, the *591 rights of parties thereto by a decree which the Secretary is bound to obey, it would seem to follow logically that after the money had passed beyond the control of the court parties claimant did not lose their right of action to have their respective shares and claims determined by a court of law, although they would be remitted to a different judicial forum, by reason of the fact that the money had passed into the public treasury, and the United States are liable to action only in this court.
The collector could no longer be sued, nor would an action lie against the Secretary of the Treasury, personally, because the money is not in his hands, but in the Treasury of the United States.
The statute allows to certain officers and informers fixed shares of the fund, not to be altered or controlled at the discretion of any one. It is only to be determined who, in fact and in law, are the parties, if any, who have those rights, and if the Secretary is only a ministerial officer, without power to settle conflicting claims, this class of cases would seem to be within the jurisdiction expressly given to this court to hear and determine cases wherein the United States having money due or claimed to be due to parties by statute law or contract refuse to pay the same.
The claims of such parties certainly seem to be founded on a law of Congress or on contract within the meaning of Revised Statutes, § 1059. It was solely upon the ground of implied contract that actions were maintained against collectors under the act of 1799.
The jurisdiction of this court can be drawn in question only on the ground that the Secretary of the Treasury is something more than a ministerial officer in this matter. There is quite as much reason why i>arties claimant to such funds should have the right to have their respective claims determined by a court of law, now that the money is to be distiibuted under the direction of the Secretary of the Treasury by the act of 1867, as there was when it was to be paid out by the collectors under the law of 1799, for the Secretary of the Treasury has no better facilities for hearing, trying, and determining disputed questions of fact, involving the examination and consideration in many cases, as in this, of hundreds of pages of manuscript documents, and evidence taken ex parte, and much less time to devote to that duty, than had the several collectors of cus *592 toms ; the Secretary having now all the cases and all the duties in that respect which were before distributed among the numerous collectors throughout the country.
The object of the law of 1867, requiring the transfer of money collected from fines, penalties, and forfeitures to be paid into the United States Treasury, was no doubt for the- purpose of preventing a large accumulation of money in the hands of collectors of customs and to insure its more safe keeping. It is a well-known historical fact that such was the object of Congress, in 1839, in passing the provisions of the act of that year, (Act March 3, 1869, 5 Stat. L., 348, § 2,) requiring collectors to pay into the public treasury all money received by them for unascer-tained duties, or for duties paid under protest, the retention of which to await the result of suits pending against them therefor had just previously led to great aud notorious frauds and losses. (Carey v. Curtis, 3 How., 413.) The Supreme Court decided that this act of 1839 took away the right of action against collectors by parties who had paid duties under protest, (Carey v. Curtis, above cited,) and there being then no Court of Claims, and the United States not being liable to actions, parties were wholly without legal remedy in the courts of law. This result appeals to have been accidental, aud not intended by Congress, and as soon as that decision was rendered the right of action was restored. (5 Stat. L., 727.)
So the act of 1867 was manifestly not passed for the purpose of depriving parties of all resort to the courts of law for the determination of their controverted claims to funds arising from forfeitures, nor for the purpose of conferring upon the Secretary of the Treasury the power to determine judicially or as a matter of discretion who, as officers or iuformers, are entitled to share in such funds. The language of the act is that the money shall be distributed “under his direction,” not according to his discretion, nor upon his award or decision.
If then, again, the Secretary of the Treasury is to be regarded as only a ministerial officer with respect to such funds, as was the collector of customs under the former act, the jurisdiction of this court would seem to be sustained by the principles which we have recognized in the cases of Horace Boughton and George W. Campbell et al., (ante. pp. 330-470.)
There is a special reason, in connection with the considerations which we have set forth, why this court' might perhaps *593 be justified in taking jurisdiction of this action. It will be seen that the Secretary of the Treasury exercised his power and distributed the money in question conditionally, making the payment depend upon the giving of bonds by the distributees, to refund the same in case this court, or the Supreme Court on appeal, should decide that any other person is entitled to share as informer or seizing-officer.
The Secretary thus expressly submitted the matters now in controversy to the determination of this court, so far as it was within his power to do so. As to the claimant, the action of the Secretary was the same, jiractically, as though he had refused to pay the money to any one. Of course the Secretary of the Treasury cannot confer jurisdiction where none is given by statute, but, if there be concurrent jurisdiction, the Secretary might decline to exercise his power and might turn the parties over to this court for their legal remedy. Or if the jurisdiction of the court depends, in such cases, upon the Secretary himself not undertaking to determine conflicting rights, and his refusal to make distribution whenever a conflict arises, on the ground that he is a ministerial officer with power to pay the money only when there are no controversies, or when all controversies have been j ndieially determined, as was the case with collectors when they made such distribution, then the action of the Secretary in this may be taken as a refusal to distribute the money in question.
But this question of jurisdiction was not argued by claimant’s counsel, and therefore, as well as because we do not find it necessary to pass upon it while reviewing the statutes and decisions far enough to make it apparent that a solution of the question may not be free from difficulty, we express at this time no final opinion on the subject. And we do this especially bécause the question may arise in other cases, when we shall have the benefit of a thorough examination and full arguments on both sides, and can better form a correct opinion thereon.
We are satisfied that on the merits the claimant has no cause of action. He claims as an informer and as seizing-officer, and if he had proved himself to have been either he would be entitled to one-quarter part of the forfeiture according to the provisions of the Act March 3, 1867. (14 Stat. L., 546, ch. 138.)
An informer, within the meaning of the statute, is one who gives the first information, in consequence of which a seizure is *594 made and forfeiture consummated. The communication of a vague rumor, commonly known in commercial circles and elsewhere, that a person has committed frauds against the revenue, without some information as to what frauds have been committed and some clew to their detection, does not constitute one an informer within' the meaning of the statute. (13 Opins. Atty. Gen., 239.)
The facts show conclusively, we think, that the claimant not only did not inform the Government officers of the frauds upon which the forfeitures in this case were founded, but also that he had no actual knowledge of those frauds or any others com-, mitted by the same parties.
In May, through another party, he informed Mr. Collector Casey that frauds were committed in the custom-house on the weights and classification of sugar. This was only repeating a rumor current, as the facts find, on the street, in commercial circles, and in the newspapers. In consequence of this information, such as it was, the collecter, on the 5th of June, did employ the claimant and the other party referred to for the purpose of ferreting out the sugar-frauds, and his immediate action shows that he had no real knowledge of any frauds committed/ Instead of seeking to ferret out frauds already committed, he set himself about watching for future cases. He went on board the Dexter Washburn, then in port with a cargo of sugar on board, took the weights and obtained samples, and then waited until the owners had entered their sugar at the custom-house, when he presented his weights and samples to the collector for comparison.
If, by this comparison, frauds were thereupon detected, it was in consequence of his direct information obtained in part through his labor and services while in the employment and pay of the Government as an officer detailed for the purpose of procuring this very information. That an officer of the customs-service, as well as a private citizen, may be an informer, entitled to share in forfeitures, is no doubt true, but it is only when he obtains his knowledge “incidentally, and not in the direct prosecution or course of his duty or of any special retainer for that purpose.” On this subject Judge Lowell, of the United States district court for Massachusetts, has well stated the rules applicable thereto. He says:
“It is not denied that some officers of the customs, other *595 than the collector himself and the surveyor and naval officer— all of whom share in all the forfeitures — may themselves b© informers. This has been decided so far as inspectors are concerned, and perhaps is true of deputy collectors. (Hooper v. Fifty-one Casks of Brandy, Davies R., 370; Brewster v. Gelston, 11 Johns. R., 390; Sawyer v. Steele, 3 Wash., C. Cls. R., 464.) And. as to officers of revenue-cutters, the act is explicit in their favor; but I am not aware that it has ever been said or thought that an officer, being charged with the special duty of searching a vessel, in pursuance of definite information given by another person, could become the informer by reason of the diligence, fidelity, and success with which he prosecuted the search and found what he was sent to seek. To allow this Avould be contrary to the general principles of law and to the interest of the revenue laws, which expect the collector and his subordinate officers to pursue the course indicated by the information with all the means and efforts that may be necessary.” (The United States v. Fifty Thousand Cigars, 1 Lowell R., 22.)
And again the same learned judge says:
“In my view, the cases in which an officer may be an informer are, where he incidentally, and not in the prosecution or course of his duty or of any special retainer for that purpose, makes a discovery, as if an inspector, put on board of a vessel merely to keep the cargo safely, discovers smuggled goods concealed, or where an officer set to inquire into a particular charge discovers something entirely different and before unsuspected, or where he is told by some one as a friend aud not as an officer of facts which his informant, not wishing to be known, refuses to bring forward himself, but tells him for the very purpose of enabling him to give information in his own name — in these cases an officer may be an informer. I do not at present think of any others. Mr. Hawley’s case, which has given me more trouble than any other, must be governed by these considerations. In my judgment, his retainer as a revenue-agent, under pay, to investigate these frauds, makes his time the time of the Government and his information the information of the Government, and he cannot justly lay claim to any share of this reward.” (The United States v. Barrels Distilled Spirits, 8 Int. Rev. Record, 20.)
The information obtained by the present claimant as to the sugars on board the Dexter Washburn did not lead to the seize *596 ure and forfeiture in tbis case. The sugars, tbe forfeiture of which he is now seeking to share in, were another lot, stored in warehouses, and the frauds were ascertained from a different source.
Mr. Dillingham, the naval officer, by investigations instituted by himself alone, discovered the frauds in relation to the warehouse sugars which were subsequently seized, and afterward he took the claimant into his pay and service as a clerk for the Government in his office “to work up the cases” and to act under himself in further investigations. But this was not until the naval officer’s investigation had proceeded so far that he had impounded the sugars and given directions to the official custodian thereof to allow none of them to be withdrawn, and none were thereafter removed by tbe owners, although they made an effort at such withdrawal. And the fact found is that the discovery made by the naval officer was the first information which led to the seizure.
Not being an informer, was the claimant, then, a seizing-officer in that sense which would entitle him under the statute to one-quarter part of the forfeiture.?
This large share, equal to that given to the collector, surveyor, and naval officer together, was offered by the statute to the seizing-officers, no doubt, to compensate them for their vigilance and activity, and for the great labor, peril, and personal risk and liability to which they might be subjected. When, however,-as in this case, the articles to be seized were in warehouses under the control and in the custody of revenue-officers, appointed to guard and retain them until authorized by the collector to permit their discharge, the only seizure required was a technical one, for the sole purpose of laying the foundation for legal proceedings for forfeiture, and that was done by a simple authoritative notice to the warehouse-keeper, in the presence of the goods, that the articles were seized, with directions to retain them.
It seems to have been the practice of the Treasury Department' to hold that in such case there could be no seizing-officer .within the meaning of the act of 1867. The Attorney-General, in 1869, expressed a different opinion on the abstract proposition, not having before him, however, a case in which it was necessary to determine under exactly what circumstances and *597 by what acts an officer in such case became such seizing-officer entitled to share in the forfeitures. (13 Opinions, 255.)
But the facts found in this case do not render it necessary to determine whether a clerk of the Government in the naval office, who is sent to execute the order of his superior officer in the technical seizure of property in the custody of other revenue-officers, for the purpose of laying the foundation for proceedings of forfeiture, either as the medium of the transmission of a written order to the custodian of the property or otherwise, would be a seizing-officer or not.
The present claimant did absolutely nothing in the matter of this seizure. It seems to have been made by an order from the collector to the superintendent of the warehouses where the property was stored, and by him transmitted in writing to the storekeeper having the immediate custody of the property, and nothing more was done. At the time the seizure took effect there were present the naval officer, deputy collector, and superintendent and storekeeper of the warehouses, as well as the claimant, and he was only a witness to the proceedings.
Under these circumstances the claimant was not the seizing-officer, and, as we have before shown, he was not the informer.
His petition must, therefore, be dismissed on the merits.
Boring- and Peok, JJ., heard this case, but were absent when it was decided.